IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JEFFREY HARIG,** | * | |
| **Plaintiff** | * | |
| v. | * | CIVIL NO. JKB-15-960 |
| **PROGRESS RAIL SERVICES CORP.,** | * | |
| **Defendant** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

Plaintiff Jeffrey Harig ("Plaintiff"), a Maryland resident, brought this action in the Circuit Court for Frederick County, Maryland, asserting a single count for breach of contract against Defendant Progress Rail Services Corporation ("Progress Rail" or "Defendant"), an Alabama corporation with its principal place of business located in Albertville, Alabama. (ECF No. 1 at 2 & No. 2 at 4.)[1] Defendant removed the action to this Court on diversity grounds pursuant to 28 U.S.C. §§ 1332(a), 1441. Now pending before the Court is Defendant's Motion for Summary Judgment, filed under Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 22.) The issues have been briefed (ECF Nos. 22–1, 29 & 30), and no hearing is required, Local Rule 105.6 (D. Md. 2014). For the reasons explained below, Defendant's Motion will be DENIED.

---

[1] Plaintiff originally named Caterpillar Inc., a Delaware corporation, as a codefendant in this action, but Plaintiff voluntarily dismissed Caterpillar Inc. on April 7, 2015, pursuant to Rule 41(a)(1)(A) of the Federal Rules of Civil Procedure. (ECF No. 9.)

## I. Background[2]

### A. *Plaintiff's History with Progress Rail*

Plaintiff is a veteran of the rail-services industry. In 1988, Plaintiff and his father formed DJR, Inc. ("DJR"), a corporation involved in the installation of railroad signal equipment. (ECF No. 29–1 at 3.) Plaintiff's brother joined the company several years later. (*Id.* at 4.) In 2000, DJR was acquired by Harmon Industries ("Harmon") in a stock swap (*id.* at 4-5);[3] Harmon was subsequently acquired by General Electric ("GE") (*id.* at 5). In 2006, GE sold what had been the DJR/Harmon business to Defendant Progress Rail. (*Id.* at 7.) Although Plaintiff relinquished his ownership stake in the company,[4] he stayed on in a managerial capacity throughout this period. Plaintiff also functioned as the company's landlord: he rented two buildings on his farm in Taneytown, Maryland, to Progress Rail. (*Id.*)

During his tenure as a Progress Rail manager, Plaintiff worked long hours, but his schedule varied considerably. He was "never told of any assigned hours"; depending on the company's needs, he "would work nights, weekends, any time that [his] job[] would have to be done." (*Id.* at 17.) Though he often worked off-site, Plaintiff also maintained a home office at the Taneytown farm. (*Id.*)

At some point in the late 2000s, Bob Roberts, a former division vice president at Progress Rail, became aware that Plaintiff was "asking employees to strip the leftover copper and aluminum from Progress Rail job materials, selling that material, and pocketing the proceeds from those sales." (ECF No. 22–7 at 2.) Roberts conducted an investigation at the Taneytown

---

[2] The facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing summary judgment—in this case, Plaintiff. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

[3] As part of the transaction, Harmon acquired DJR's then-existing inventory. However, Plaintiff recounted that there were "personal items" that he, his father, and his brother deemed theirs: these items "were kept in a separate place and not mixed in with any of the assets." (ECF No. 29–1 at 4.)

[4] Plaintiff sold off his stock shortly after the Harmon–GE transaction, fully divesting himself of equitable ownership in the company. (*Id.* at 5.)

site; as part of this investigation, he required Plaintiff to obtain records from the local scrapyards where he had sold the materials. (ECF No. 29–1 at 9.) According to Plaintiff, he had an informal understanding with DJR, Harmon, and GE that he could apply scrap proceeds toward his "driveway lien." (*Id.*) However, Roberts informed him that "anything like this has to come to the company." (*Id.*)[5] Plaintiff was not disciplined with respect to his scrapping activities, nor was he required to reimburse Progress Rail. (*Id.* at 31.)

In 2011, several employees left Progress Rail's Taneytown operations to form their own company. (*Id.* at 11-12, 16.) Business had slowed, and Plaintiff was concerned that more of his workers might depart; he thus advised his superiors at Progress Rail to consider a three-year contract incentive for key employees. (ECF No. 22–2 at 22.) Ultimately, Plaintiff was the only Progress Rail employee to sign such a contract. (*Id.* at 23.)

Plaintiff's contract, executed on March 20, 2012, provided that Plaintiff's employment would terminate immediately upon his resignation, death, or mental disability or upon notice from the Company with or without cause. However, the contract also included a proviso: if Plaintiff was terminated *without cause* within three years after the date of execution, and if he signed a general release in favor of Progress Rail, he would become entitled to a lump sum equal to his base salary calculated from the date of termination through the expiration of that three-year period,[6] along with continuation of his health benefits throughout that period. (ECF No. 2–1 at 2.)

The contract defined "cause" as one or more of the following:

> (i) the commission of a felony or other crime, act or omission involving dishonesty, disloyalty or fraud with respect to the Company or any of its

---

[5] In an October 8, 2015, declaration, Bob Roberts expanded on his conversation with Plaintiff, averring that he "informed Mr. Harig that he could not personally profit in any way from Company materials, Company sales, or Company customers." (ECF No 22–7 at 3.) Plaintiff's recollection of the conversation differs: according to Plaintiff, Roberts said, "'Jeff, you can't be taking the scrap; we need to turn that in to Progress.' And [Plaintiff] said, 'No problem'; and that was the extent of the meeting." (ECF No. 29–1 at 10.)
[6] This period would have expired on March 20, 2015.

3

customers or suppliers, (ii) reporting to work under the influence of alcohol or illegal drugs, the use of illegal drugs (whether or not at the workplace)[,] (iii) conduct causing the Company public disgrace or disrepute or substantial economic harm, (iv) failure to perform duties as reasonably directed by the Company, (v) any act or omission aiding or abetting a competitor, supplier or customer of the Company to the material disadvantage or detriment of the Company, (vi) breach of fiduciary duty, negligence or misconduct with respect to the Company, (vii) failure to follow and comply with Company policies and procedures,[7] or (viii) any other breach of th[e] . . . agreement.

(*Id.*)

### B. *Circumstances Surrounding Plaintiff's Termination*

In March 2013, Plaintiff's direct supervisor, Roy Smith, asked Plaintiff to contact Scott Wertans, the president of Saratoga Railroad Engineering, P.C., and a long-time Progress Rail customer. (ECF No. 29–1 at 24.) Wertans was in need of two spread spectrums and one HD link, parts used to construct a railway radio unit. (*Id.*) Smith informed Plaintiff that Progress Rail does not supply those parts; Plaintiff replied that he would "see what [he could] do." (*Id.* at 25.) Thereafter, Plaintiff located the requested items in his barn; he believed they were part of his private inventory rather than the DJR inventory that had been transferred to Harmon and successors. (*Id.* at 26.)[8] Plaintiff contacted Wertans and offered to sell him the parts: a chain of e-mails shows that Plaintiff asked for $3850;[9] that he requested a money order or cashier's check; and that he suggested the two could meet at a rest area off Interstate 95 to complete the

---

[7] Among the policies in effect during Plaintiff's tenure at Progress Rail were those outlined in the company's Code of Conduct, which provided, *inter alia*, that employees "must not engage in activities that create, or even appear to create, conflict between [their] personal interests and the interests of the company." (ECF No. 22–2 at 62.) The Code added that conflicts arise "where a personal interest or family or other relationship makes it difficult for an individual to represent the company fully and fairly." (*Id.*)
[8] The circumstances under which Plaintiff obtained the spread spectrums and HD link are rather fuzzy. Plaintiff believes he removed the parts from DJR's inventory around 1997, ostensibly to construct a communication device on the farm. (ECF No. 29–1 at 26-27.) He admitted that he did not secure permission from his father or his brother before he placed the parts in his personal stockpile. (*Id.* at 27.) However, he also consistently testified that certain items of inventory were not transferred to Harmon, GE, or Progress Rail during the acquisitions (*id.* at 4-5, 20), and Progress Rail has adduced no evidence tending to show that it had title to the parts. Regardless whether Plaintiff properly appropriated or improperly converted the parts from DJR's inventory, there is no indication that they ever belonged to Progress Rail.
[9] According to Plaintiff, the parts would have cost around $11,000 or $12,000 had Wertans purchased them from the manufacturer. Wertans was apparently "very happy at the price" that Plaintiff quoted. (*Id.* at 28.)

transaction. (ECF No. 29–6.) Wertans, uncomfortable with this arrangement, reached out to Smith (ECF No. 22–5 at 3); Smith in turn called Plaintiff and directed him not to sell personal property during company time (ECF No. 29–1 at 29). Plaintiff, eager to "[s]hake [his] hands clear of this" (*id.*), e-mailed Wertans and told him that he "could not locate" the parts after all (ECF No. 29–6 at 6).

Behind the scenes, Progress Rail management was apparently disturbed by Plaintiff's conduct. Prior to calling Plaintiff, Smith had alerted Hyung Kim, Plaintiff's second-line supervisor, about the proposed transaction; in an April 15, 2013, e-mail, Kim wrote that if Plaintiff "can prove he purchased [the parts] through his funds then he has the right to sell [them] but he shouldn't be doing this outside of his normal duties." (ECF No. 22–2 at 81.) On April 17, 2013, Smith e-mailed Plaintiff—copying Kim—to confirm that it was a violation of Progress Rail policies to "sell[] any material or mak[e] . . . this type of transaction[] during PRS scheduled working hours." (*Id.* at 80.) Notably, Smith's e-mail neither contested Plaintiff's ownership of the parts nor informed Plaintiff that transacting with Wertans *off the clock* would violate any Progress Rail policy.

After the phone call and confirmatory e-mail from Smith, Plaintiff heard nothing more about the proposed Wertans transaction—until May 24, 2013, when Kim called Plaintiff and informed him that he was being terminated.[10] The substance of this conversation is disputed. Plaintiff testified that the call lasted no longer than five minutes and that Kim told him he was being fired for "conducting personal business during Progress Rail time" and "sen[ding] some e-mails conducting personal business during . . . normal working hours." (ECF No. 29–1 at 31-32.) Kim, however, testified that that the call lasted about thirty minutes and that he told

---

[10] At this same time, Defendant moved its operations off the Taneytown site and advised Plaintiff that it would not be renewing its lease. (*Id.* at 32.)

Plaintiff he was being terminated for "conflict of interest, code of conduct violation." (ECF No. 29–3 at 12-13.) Bud Lawlor, a human-resources manager who was also on the call, testified that the conversation lasted "ten minutes or so" and that Kim did not "go[] into much detail as to why" Plaintiff was being fired, though Lawlor also averred that Kim had separately informed him about Plaintiff's "attempt[] to circumvent the company's processes for the sale of goods to customers." (ECF No. 29–4 at 6-7.)

Following his termination, Plaintiff asked Defendant to supply him with a suitable general-release document pursuant to his contract; Defendant has declined to do so, and has further declined to pay Plaintiff any of the severance prescribed by the contract, as Defendant believes that it terminated Plaintiff for cause. (ECF No. 2 ¶ 12 & No. 10 at 2-3.) On January 21, 2015, Plaintiff filed a single-count action for breach of contract in the Circuit Court for Frederick County, Maryland, seeking damages equal to the compensation and medical benefits he would have received for the period extending from May 24, 2013, through March 20, 2015.[11] Defendant removed the action to this Court on April 3, 2015 (ECF No. 1), and Defendant thereafter moved for summary judgment (ECF No. 22). Plaintiff filed a response in opposition (ECF No. 29), and Defendant replied (ECF No. 30). Defendant's Motion is now ripe for decision.

## II. *Standard for Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the

---

[11] Plaintiff avers that he would have earned $254,296.95 plus benefits (ECF No. 2 at 4), thus easily satisfying the $75,000 amount-in-controversy requirement for this Court's diversity jurisdiction. *See* 28 U.S.C. § 1332(a).

burden of proof. *Celotex Corp.*, 477 U.S. at 322-23. The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of his pleading but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits must be made on personal knowledge with such facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed. R. Civ. P. 56(c)(4).

### III. Analysis

#### A. Choice of Law

"A federal court sitting in diversity is required to apply the substantive law of the forum state, including its choice-of-law rules." *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 986 (2014). Maryland courts have long held that the "parties to a contract may agree as to the law which will govern their transactions." *Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803 (Md. 2007) (quoting *Kronovet v. Lipchin*, 415 A.2d 1096, 1104 (Md. 1980)). In this case, Plaintiff's employment contract specifies that it will be "governed and construed in accordance with the laws of the state where [Plaintiff's] primary office with [Defendant] is situated at the time any action for enforcement . . . is commenced." (ECF No. 2–1 at 5.) Plaintiff's primary office was located in Taneytown, Maryland, so Maryland law presumably governs the agreement.

Plaintiff observes, however, that because he was fired, he no longer has a "primary office" with Defendant. "This dynamic," he reasons, "opens the door for the Court to potentially apply *Alabama* law . . . since Defendant's main office is in Alabama and that is the location where the contract was apparently negotiated and signed by representatives of Defendant." (ECF No. 29 at 2 (emphasis added).)

The Court does not find Plaintiff's contention persuasive. As a matter of contract interpretation, the Court presumes that the reference to Plaintiff's "primary office" encompasses the office that Plaintiff most recently occupied in his employment with Defendant. After all, employment litigation routinely arises after the employment relationship has been severed. To read the parties' choice-of-law provision as applying only for the duration of Plaintiff's employment would render the provision largely nugatory, violating the canon of construction that contracts must be interpreted in their entirety and that, "if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 233 (Md. 2013) (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)).

But even were the choice-of-law provision unenforceable, Maryland law would still apply. In the absence of such a provision, Maryland courts apply the rule of *lex loci contractus*, which requires that "the construction and validity of a contract be determined by the law of the place of making of the contract." *Am. Motorists Ins. Co. v. ARTRA Grp.*, 659 A.2d 1295, 1300 (Md. 1995); *see also Konover Prop. Tr., Inc. v. WHE Assocs.*, 790 A.2d 720, 728 (Md. Ct. Spec. App. 2002) ("For choice-of-law purposes, a contract is made where the last act necessary to

make the contract binding occurs."). Here, Plaintiff signed the "ACCEPTED" line on his contract—presumably the final act necessary to make the agreement binding—in Maryland. The contract was accordingly "made" in Maryland, and Maryland law controls.[12]

### B. *Contract Interpretation and For-Cause Protection*

To prevail in an action for breach of any contract—including an employment contract—a plaintiff must prove "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). In analyzing contract terms, Maryland courts follow the rule of objective contract interpretation: "[T]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding." *Dumbarton Improvement Ass'n*, 73 A.3d at 232 (quoting *Slice v. Carozza Props., Inc.*, 137 A.2d 687, 693 (Md. 1958)).

Employment agreements in Maryland are presumptively at-will. However, a contract may "overcome that presumption and create an employment relationship whereby the employee may be terminated only for just cause." *Towson Univ. v. Conte*, 862 A.2d 941, 947 (Md. 2004).

---

[12] For that matter, even if the contract were "made" in Alabama, Maryland law would likely *still* control the Court's analysis due to Maryland's limited *renvoi* exception to *lex loci contractus*. Under this limited exception, Maryland courts apply Maryland substantive law to contracts formed in other states where (1) Maryland has the most significant relationship or at least a substantial relationship to the issues presented and (2) the state where the contract was formed would apply Maryland substantive law in resolving those issues. *Am. Motorists Ins. Co. v. ARTRA Grp.*, 659 A.2d 1295, 1304 (Md. 1995). The first *renvoi* prong is plainly satisfied here, as the conduct giving rise to Plaintiff's termination occurred solely in Maryland. As for the second prong, it appears that an Alabama court would apply Maryland law on these facts. *See Unisource Worldwide, Inc. v. S. Cent. Ala. Supply, LLC*, 199 F. Supp. 2d 1194, 1201-02 (M.D. Ala. 2001) ("[T]he Supreme Court of Alabama [has] held . . . that when the parties have chosen a particular state's law to govern a contract . . . the fallback position is not *lex loci contractus*, but rather the Restatement (Second) of Conflict of Laws §§ 187 and 188, which includes more than just *lex loci contractus*. . . . Section 188 basically provides that the law to be applied is the local law of the state which has the most significant relationship to the transaction and the parties."); *see also* Restatement (Second) of Conflict of Laws § 188(2) (Am. Law Inst. 1971) (prescribing holistic analysis that takes account of such factors as place of negotiation, formation, and performance; location of contract's subject matter; and domicile and place of business of each party).

When an employer terminates an employee with for-cause protection and the employee thereafter sues for breach of contract, the factfinder may not "scrutinize the factual bases for the decision to terminate." *Id.* at 950. Rather, the proper role of the factfinder is to "review the *objective* motivation, *i.e.*, whether the employer acted in objective good faith and in accordance with a reasonable employer under similar circumstances when he decided there was just cause to terminate the employee." *Id.* (emphasis in original). The factfinder's inquiry should "center on whether [the] employer's termination was based upon any arbitrary, capricious, or illegal reason, or on facts not reasonably believed to be true by the employer. But the fact-finding prerogative remains with the employer, absent some express intention otherwise." *Id.*; *see also Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 371 (D. Md. 2014) ("Objective reasonableness of an employer's just cause determination requires that: (1) the employer act in objective good faith (meaning good faith from the perspective of a reasonable employer, not of the individual employer); and (2) that the employer base its decision on a reasoned conclusion supported by substantial evidence.").

However, the "premise that the employer . . . retains the fact-finding prerogative does not render 'illusory' the promise not to terminate except for just cause." *Conte*, 862 A.2d at 952. "Although an employer's personnel decisions should not be second-guessed, a court may determine whether an employer terminated an employee *for the reasons the employer cites* as for cause." *Innovative Therapies, Inc.*, 302 F.R.D. at 375 (emphasis added). Moreover, the burden of proving good cause for termination rests on the employer. *Jorgensen v. United Commc'ns Grp. Ltd. P'ship*, No. 8:10-CV-00429-AW, 2011 WL 3821533, at *6 (D. Md. Aug. 25, 2011); *Tricat Indus., Inc. v. Harper*, 748 A.2d 48, 64 (Md. Ct. Spec. App. 2000).

### C. *Application*

In its memorandum accompanying its Motion for Summary Judgment, Defendant characterizes this case as straightforward: "Plaintiff was terminated because Defendant believed he was violating its Code of Conduct—specifically, that he attempted to engage in impermissible self-dealing that presented a conflict of interest." (ECF No. 22–1 at 5.)[13] However, it is far from clear that Defendant's agents—including Hyung Kim—were principally motivated at the time of Plaintiff's termination by concerns over his purported self-dealing. To draw such a conclusion, the Court would necessarily be required to make credibility findings and to resolve disputed points in Defendant's (*i.e.*, the movant's) favor, which it cannot and will not do at the summary judgment stage.

According to Plaintiff, when Roy Smith contacted him by phone after hearing from Scott Wertans, Smith warned Plaintiff about conducting personal business on "company time." (ECF No. 29–1 at 29.) Smith reiterated that concern in an e-mail that he sent Plaintiff after conferring with Kim. (ECF No 22–2 at 80.) Likewise, Plaintiff testified that the *sole reason* Kim provided for his termination was his alleged transacting of "personal business during Progress Rail time." (ECF No. 29–1 at 32.)[14] The Court does not doubt that time theft is a legitimate concern for some employers—but it does not appear to be a serious concern at Progress Rail. Several of Defendant's employees admitted that they periodically arrive late, leave early, take long lunches, and attend to personal affairs during the workday.[15] Moreover, Plaintiff testified that he had no fixed working

---

[13] Defendant believes that such conduct violated subsections (i), (iv), (v), and (vii) of the cause provision in Plaintiff's contract. (ECF No. 22–1 at 5.) These subsections define cause to include acts of dishonesty/disloyalty/fraud with respect to Defendant; failure to perform duties as reasonably directed by Defendant; acts or omissions that aid a customer to the material detriment of Defendant; and failure to comply with Defendant's policies and procedures. (ECF No. 2–1 at 2.)

[14] As noted above, Kim's recollection of the termination call differs materially from Plaintiff's: Kim believes that he told Plaintiff the termination was due to "conflict of interest, code of conduct violation." (ECF No. 29–3 at 13.)

[15] For instance, Kim admitted that he has probably been late for work twenty to thirty times since he started with Progress Rail in early 2013, and he added that he leaves early five to ten times each month. (*Id.* at 3.) Bud Lawlor

hours (a point unrefuted by Defendant) and that he frequently worked at night, on the weekends, and from his home office. (ECF No. 29–1 at 17.) Additionally, the e-mails that Plaintiff sent Scott Wertans to arrange the sale were timestamped 7:33 a.m., 6:35 a.m., and 7:27 a.m.—all before normal business hours.[16] (ECF No. 29–6.) On these facts, Defendant could not have reasonably penalized Plaintiff for transacting on company time.

Nor could Defendant have reasonably penalized Plaintiff for misappropriating company property—because there is no evidence that the parts in question belonged to Defendant. Judging from the e-mail chain, it appears that Kim was at least preliminarily concerned about the ownership status of the parts (ECF No. 22–2 at 81), and during his deposition, he recalled an "internal belief that the parts belonged to Progress Rail" (ECF No. 22–6 at 5). But Kim also indicated that he was "not sure" whether this "internal belief" was ever conveyed to Plaintiff. (*Id.*) And he admitted that he could not verify who owned the parts (*id.* at 7); he separately conceded that, following an investigation, Defendant "couldn't determine definitively whether [the parts] were Progress Rail parts or not" (ECF No. 29–3 at 9). As for Plaintiff, he unequivocally and repeatedly insisted that the parts were his personal property and that they were not included with the inventory transferred from DJR to Harmon, GE, and, eventually, Progress Rail. (ECF No. 29–1 at 26.) While misuse of company property might well constitute just cause for termination under Plaintiff's contract, a nebulous "internal belief" not rooted in fact (and contradicted by sworn testimony) is plainly insufficient.

In an October 7, 2015, declaration, Kim alluded to yet another possible reason underlying the termination decision: "Mr. Harig's actions . . . left a loyal customer of Progress Rail's in the

---

averred that he chats with coworkers about non-work-related matters daily; that he speaks with his wife on the phone daily; and that he takes extended lunch breaks twice a month. (ECF No. 29–4 at 3-4.)

[16] Though Kim could not recall whether Plaintiff had fixed working hours, he noted that exempt employees at Progress Rail typically work from 8:00 a.m. to 5:00 p.m. (ECF No. 29–3 at 3, 5.)

lurch, which was a serious issue for the company." (ECF No. 22–3 at 3.)[17] This assertion is implausible. Plaintiff only withdrew his offer to Wertans after receiving Smith's cryptic phone call about transacting on company time—and there is no evidence whatsoever that any of Defendant's agents asked Plaintiff to work with them to devise an appropriate solution for Wertans. As Plaintiff testified:

> Roy Smith did not call and say, "Hey, Jeff, why aren't you selling these parts to Scott?" . . . You know, they made it sound like Scott was all upset that he did not get the parts. Well, how hard would it have been for Roy Smith to call . . . or any of the bosses to call . . . and ask . . . about it?

(ECF No. 29–1 at 31.)

Neither misuse of company time nor misappropriation nor poor customer service could have justified Plaintiff's termination on *these* facts. That leaves Defendant with its disloyalty/conflict theory—*i.e.*, that Plaintiff, by proposing a private sale to a long-time Progress Rail customer, engaged in impermissible self-dealing in violation of company policy. Perhaps a factfinder, in light of the full panoply of evidence and testimony presented at trial, might agree.[18] But Defendant's remaining theory is far too slender a reed to support its summary judgment motion, given that (1) all facts and inferences must be taken in the light most favorable to Plaintiff, *Scott*, 550 U.S. at 378, and (2) Defendant bears the burden of proving that it had just cause to terminate Plaintiff, *Tricat Indus., Inc.*, 748 A.2d at 64. On the basis of the present record, a factfinder might well conclude that Plaintiff was simply following his supervisor's instructions when he reached out to Scott Wertans; that Plaintiff reasonably believed he was

---

[17] Kim added that the transaction "could have been considered permissible" had Plaintiff "advised the company that he owned the parts, offered to sell the parts to Progress Rail, and allowed Progress Rail to maintain its customer relationship and resell the parts to Mr. Wertans." (ECF No. 22–3 at 3.) There is no indication that Kim (or any of Defendant's agents) ever proposed this roundabout three-way transaction to Plaintiff.

[18] This assumes, of course, that Plaintiff's purported self-dealing was the *actual* reason underlying Kim's decision to terminate Plaintiff and not merely an *ex post* justification for that decision. Given the assortment of rationales that Defendant's agents (and Kim himself) apparently contemplated, the Court is not prepared to make that determination at this stage.

doing his company a favor by selling parts (at a bargain-basement price) that he owned outright and that Defendant did not maintain in its inventory;[19] and that Defendant *unreasonably* failed to work with Plaintiff to devise a mutually acceptable solution (such as the three-way transaction that Kim now deems "permissible"). A rational factfinder could thus conclude that Defendant neither acted in "objective good faith" in terminating Plaintiff nor "base[d] its decision on . . . substantial evidence," *Innovative Therapies, Inc.*, 302 F.R.D. at 371, and that Defendant is consequently liable under the contract.[20]

To be clear: the Court offers no forecast as to the final disposition of this matter. Such disposition will turn entirely on the evidence proffered and the arguments presented at a bench trial, to be scheduled forthwith. But Defendant's motivation for firing Plaintiff is clouded at this stage by genuine issues of material fact, and so summary judgment is improper.

## IV. Conclusion

For the foregoing reasons, an order shall enter DENYING Defendant's Motion for Summary Judgment (ECF No. 22).

---

[19] Indeed, Plaintiff testified as much:
> Roy was trying to help Scott because Scott is a good . . . client of Progress.
> He buys material from them, so whenever, you know, another person asks for something . . . you are trying to help them so that they will continue to deal with Progress. You know, so . . . it just seemed like . . . if I could help him, I would help him.

(ECF No. 29–1 at 25.)

[20] In his opposition brief, Plaintiff presents an alternate theory of the case: he posits that Defendant had predetermined to close the Taneytown facility and that it fabricated a violation out of whole cloth so as to terminate him without incurring a severance liability. Plaintiff adduced some evidence tending to show that Hyung Kim viewed the Taneytown operations as redundant (ECF No. 29–3 at 5, 7), and Plaintiff testified that Progress Rail management was uncomfortable with its employer-lessee status (ECF No. 29–1 at 8)—but Defendant countered with Kim's declaration that, prior to the proposed transaction with Scott Wertans, Kim "had no intention of terminating Mr. Harig's employment" and "felt it was important for Mr. Harig to remain with the company since he was the most senior employee in Maryland." (ECF No. 22–3 at 2.) In view of the summary judgment record, Plaintiff's alternate theory would likely require a significant inferential leap—but the Court need not parse the merits of this alternate theory in resolving Defendant's pending Motion, and it declines to do so.

DATED this 18th day of December, 2015.

BY THE COURT:

/s/
James K. Bredar
United States District Judge